NEW YORK SHIPBUILDING CORPORATION, Respondent, vs. WOLINSKY IRON & METAL COMPANY, Appellant. [Two cases.]

*October 8—November 7, 1956.*

For the appellant there was a brief and oral argument by *Harry S. Sicula* of Milwaukee.

For the respondent there was a brief by *Michael, Spohn, Best & Friedrich,* attorneys, and *Herman E. Friedrich* and *John K. MacIver* of counsel, all of Milwaukee, and oral argument by *Mr. Friedrich* and *Mr. MacIver.*

FAIRCHILD, C. J.  At the time of the events involved on these appeals, Nesco, Inc. (hereinafter referred to as "Nesco," and now the New York Shipbuilding Corporation), was a New Jersey corporation licensed to do business in Wisconsin, and was engaged in the manufacture and sale of various appliances. During that time it also manufactured cartridge shells for the United States government. Wolinsky Iron & Metal Company, Inc. (hereinafter referred to as "Wolinsky"), was a Wisconsin corporation engaged in the purchase of scrap metal.

On or about April 1, 1951, an agreement was entered into between Wolinsky and Nesco whereby Wolinsky was to purchase Nesco's entire output of brass scrap. Such scrap consisted of both solids, or "heavy" scrap, and borings or turnings, or "light" scrap. In order to insure that the brass would go back to the mills for reuse in vital industry, it was agreed between the parties that all brass scrap should be shipped by Wolinsky to such mills and manufacturers as should be designated by Nesco. Wolinsky expended $10,150 for special hoppers, which were located in the Nesco plant at points convenient for the depositing of the scrap as it came in the form of residue from the manufactured cartridges. After the scrap was put in these hoppers, or, in the case of "light" scrap, in burlap bags, it was weighed by Nesco employees, the bags were sewn up, taken to the loading platform outside of the manufacturing plant, and there loaded by Nesco employees onto Wolinsky trucks. Before the scrap left the Nesco premises, weight tickets, prepared by Nesco, were given to and signed by the driver of the Wolinsky truck.

When the agreement was first made in April, 1951, the scrap was sold to Wolinsky at the going rate. On July 10, 1951, the Nesco invoices reflected the change in price ordered by the Office of Price Stabilization in its Regulation No. 47, which placed price ceilings on brass scrap under its table of maximum rates and other provisions. Nesco charged Wolin-

sky the OPS ceiling prices from the time they became effective until the time business relations between the parties were broken off in February, 1953. On that date the Nesco books showed an unpaid balance of $17,218.10 covering the last seven invoices sent to Wolinsky. Nesco seeks judgment to recover that amount. Wolinsky, in its separate action, seeks judgment to recover $10,150 which it paid for bags and hoppers, plus $54,865.07 for material which it alleges was never delivered to it by Nesco. Wolinsky also claims that Nesco violated the OPS regulation, and further claims that it (Wolinsky) was damaged to the extent of a $25,000 loss of business because of a breach of an alleged five-year contract by Nesco.

It is undisputed that $17,218.10, covering the last seven invoices to Wolinsky, remained unpaid at the commencement of the Nesco action. In order to determine whether or not any of that amount is offset by the Wolinsky action, we will first consider the questions raised by that action:

1. Was there a valid five-year contract for the purchase and sale of brass scrap between Nesco and Wolinsky, dating from April 1, 1951?

2. Did Wolinsky expend $10,150 for equipment on behalf of Nesco?

3. Did Nesco short-weight Wolinsky on brass scrap sold to it?

4. Did Nesco violate OPS Regulation No. 47?

The trial court in its findings and conclusions of law answered all these questions in the negative. Appellant brings his appeal here claiming that the findings are against the preponderance of evidence. He of course has the burden of showing that the preponderance of evidence is in his favor.

As to the first question. Appellant seeks to establish that the agreement of April 1, 1951, entered into between it and Nesco, constituted a five-year contract. Appellant alleges in its complaint that Nesco breached its contract when it

terminated relations with appellant in January, 1953. Appellant now contends that as a result of such breach it suffered a loss of $25,000 worth of potential business which it would have enjoyed in the remaining two years of the alleged contract. In support of its claim of the existence of a five-year contract, appellant points to the magnitude of the operation carried on between it and Nesco, and further advances the argument that Wolinsky would not have expended $10,150 for hoppers and bags on the basis of a day-to-day operation, and concludes that therefore its agreement with respondent must necessarily have involved a long-term contract. In an effort to show the alleged five-year contract, appellant introduced a letter, dated February 10, 1953, written by Mr. Wolinsky to Mr. Frank Reibold of Nesco. However, the only reference to a five-year contract in that writing is in that portion of the letter which reads:

"Now then when we first started the account we were to put this expensive equipment in and *we should have a five-year contract* or more but the circumstances appear that your firm is moving out of Milwaukee, and . . . " (Emphasis supplied.)

That letter was written in February, 1953, after the agreement had been terminated. The reference there to a five-year contract cannot in any sense be translated into an existing five-year contract. On the contrary, the inference is that no contract for five years actually existed. That same letter also suggests a proposal "to work out a contract for the next year." Obviously, if Wolinsky had a five-year contract from 1951, it would not ask for another contract for the year 1954.

Against the contention of appellant, there was testimony by Walter Lohman, director of purchases for Nesco up to March, 1953, presently employed by the Heil Company, and a disinterested witness, that there was a day-to-day agreement, and that "no agreement or other answer was given by me which would have led to Wolinsky's assuming that he

had such a [five-year] contract." In any event, since there appears no writing in the record which can be translated into a five-year contract, the statute of frauds would operate to render void any oral contract for five years which appellant alleges it had with respondent. Sec. 241.02 (1), Stats., provides:

"AGREEMENTS, WHAT MUST BE WRITTEN. In the following case every agreement shall be void unless said agreement or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party charged therewith:
"(1) Every agreement that by its terms is not to be performed within one year from the making thereof."

In view of the lack of any showing of a written contract, therefore, appellant's claim that there was a breach of contract cannot be sustained, and there is no need for further discussion of the matter.

As to the second question. Appellant alleges that it expended $10,150 for equipment on behalf of respondent to enable it to collect and remove brass scrap from its premises, and claims that it is entitled to reimbursement for that expenditure. Appellant fails to produce any evidence showing that Nesco ordered or agreed to pay for any of said equipment. Wolinsky never billed Nesco for any equipment, and the question of reimbursement by Nesco did not arise until after Nesco had brought its action against Wolinsky. Even more conclusive of the fact that Wolinsky bought and owned the equipment is the evidence that its full purchase price was included in appellant's expense account for income-tax purposes. The understanding between the parties that Wolinsky was to furnish the equipment is contained in the letter of February 10, 1953, to Frank Reibold, credit manager of Nesco, where the writer, Mr. Wolinsky, said: "Now then when we first started the account we were to put this expensive equipment in." Further, appellant, in support of its

claim of a five-year contract, insisted that one of the reasons substantiating the assumption of a long-term contract was that it, appellant, had to amortize the cost to it of this very equipment. It did not claim then that the equipment belonged to Nesco, but that it was paid for by Wolinsky, belonged to Wolinsky, and had to be amortized by Wolinsky. As the trial court pointed out, the self-serving testimony of Mr. Wolinsky that Nesco had authorized him to expend the amount in question here on behalf of Nesco is not borne out by the record, for if the matter were as he claims, "he certainly would have exercised his astute business judgment and would have protected his company by . . . at least evidencing the intention of the respective parties by invoicing Nesco after the purchase was made."

With respect to question 3. Appellant claims that over a period of eighteen months it was short-weighted in shipments of scrap purchased by it from Nesco, and that the discrepancy between the weight it received and the weight billed to it amounted to $54,865.07. The detailed facts pertinent to that claim are as follows : Before the scrap left the Nesco premises, it was weighed by Nesco employees, and a weight certificate was made out by a Nesco employee, showing gross weight, tare, and net weight. On each occasion a copy of that certificate was given to and accepted and signed by a Wolinsky employee who trucked the scrap to the Wolinsky warehouse. The evidence is undisputed that for several weeks Wolinsky checked the weight of the shipments at its own plant and found the Nesco weights accurate. After that initial checking, Wolinsky accepted the Nesco certificates as correct and paid in full and without complaint the invoices covering the shipments involved, up to the last seven invoices. In two isolated cases,—one concerning a bag containing dust and an accumulation of dirt, which had accidentally been included with the "light" scrap; and one in which liquid was found in appellant's truck, appellant promptly notified Nesco of the

matter. As to the bag, an investigation was made with Nesco present, and full adjustment was made. As to the liquid in the truck, there was no proof that it was put there by Nesco, and no reason was ever found to account for it. The chief complaints on the part of Wolinsky to Nesco arose in connection with allowances for tare. Initially the parties had determined upon a flat tare allowance of $1\frac{1}{4}$¢ per bag used. Controversies developed over a period of time, and that allowance was finally raised to 2¢ per bag. In November, 1952, shortly before the severing of relations between the parties, at a final conference on the subject of tare allowances, a compromise was entered into between the parties whereby it was agreed that Nesco was to allow Wolinsky $2,502.52 of its total claim of $7,700. By that compromise it was agreed that all differences to date were adjusted. Wolinsky used the amount allowed by the compromise, $2,502.52, as a cash credit, applying it to sums it owed respondent.

Appellant, in effect, now relies on the matter of tare and those few isolated cases referred to above as proof that Nesco had, over a period of eighteen months, short-weighted its shipments to the extent of $54,865.07 worth of scrap, because, it is argued, Nesco had a "history of short weight." Appellant offers no concrete evidence of the additional shortage complained of, but merely bases its complaint on the fact that the mills paid for lesser quantities than shown on Nesco's certificates and on the self-serving statement of Mr. Wolinsky to the effect that "nothing further was done with the metals after withdrawn from the Nesco factory except to transport them and keep them in a cement warehouse under lock and key." No weight tickets were offered in evidence by appellant, either from his own plant or from a public scales. Ample facilities were available to appellant for verifying the weight of the shipments before they left Nesco's control. There was a public scales within a few hundred feet of the Nesco plant. Its employees could have weighed its truck

"light" on those scales and weighed it again after loading. There was evidence that such procedure was followed by a former scrap dealer, and that Nesco sent a man along with the driver of the truck to check it both "light" and "loaded." Nesco could not be held responsible for what happened to the scrap material after it left its control. Against the insubstantial argument of appellant, we have on record weight tickets prepared by Nesco at its premises and received in evidence at the trial. These certificates were never impeached in any way. They were accepted and signed for by Wolinsky employees, and the invoices reflecting the weights shown on them were paid in full by Wolinsky, with the exception of the last seven. The preponderance of evidence supports the trial court's finding that "Nesco actually delivered to Wolinsky and Wolinsky received from it in his trucks at the dock of Nesco the number of pounds of the respective materials as indicated on such invoices and the receipts signed by Wolinsky's employee accompanying each invoice."

With respect to question 4. Appellant alleges that Regulation No. 47, issued by the Office of Price Stabilization, fixing ceiling prices for brass scrap and making other provisions was violated by Nesco, inasmuch as it charged more than the maximum rate allowed, and that from the time the order became effective until the relations between the parties were terminated, such overcharge of 1¢ per pound amounted to $21,452.10.

In determining this question we set out the following portions of OPS Regulation No. 47.

Sec. 4 is entitled "Ceiling prices, f.o.b. point of shipment," and paragraph (a) of that section is entitled "Sales by any person other than a dealer." This section applies to Nesco, which was the generator of the brass scrap, as opposed to Wolinsky, which was the dealer. There are three subparagraphs under paragraph (a). Subparagraph 3 refers to "Mixed shipments" and is not involved in the facts of the

present case. The portions of subparagraphs (1) and (2) which are to be considered here read:

"(1) The ceiling price, f.o.b. point of shipment, for any grade of brass mill scrap listed in Table A below when sold by any person other than a dealer is the applicable price set forth in that table. Note, however, that the delivered price (price f.o.b. point of shipment plus transportation costs paid by the buyer) may not exceed the applicable ceiling delivered price set forth in section 5 of this regulation.

"When any brass mill scrap is sold on a 'where is' basis, an amount no less than the cost to the buyer of loading the scrap in the conveyance in which it is to be transported must be deducted from the applicable price set forth in Table A.

"Certain quantity premiums may be charged in accordance with subparagraph (2) of this paragraph and provisions for pricing mixed shipments are set forth in subparagraph (3) of this paragraph.

"Table A
"[Ceiling prices (cents per pound)]

| "Kind or grade of scrap (trade or alloy name) | Clean heavy scrap | . . . | Turnings |
|---|---|---|---|
| . . . . . . | | | |
| "Cartridge brass 70 per cent | 19.125 | | 17.875 |

"(2) *Quantity premiums.* In addition to the ceiling prices determined in accordance with subparagraph (1), of this paragraph, the quantity premiums set for in Table B may be charged if the seller, within a period of three consecutive calendar days (excluding Saturdays, Sundays, and legal holidays) delivers from one or more shipping points the specified quantity of material (i) to a public carrier for transportation to the buyer's receiving point, (ii) to the buyer at his receiving point in a conveyance owned or controlled by the seller, or (iii) upon a conveyance owned or controlled by the buyer. The amount of material delivered during any calendar day may be counted only once in determining whether a quantity premium may be charged.

"Whether a delivery or series of deliveries qualifies for a quantity premium shall be established on the basis of the

actual weight of brass mill scrap determined at the buyer's receiving point. The weight of containers, dunnage, or other tare may not be included in determining whether a quantity premium may be charged.

### "Table B

| "Quantity | Premium per pound of scrap (cent) |
|---|---|
| "20,000 to 40,000 pounds | ½ |
| "40,000 pounds or more | 1" |

We have checked the Nesco invoices and find that respondent, in billing appellant, complied with the maximum ceiling prices fixed in Table A for "light" and "heavy" scrap. Nesco added no quantity premium charges and does not claim to qualify under subparagraph (2), inasmuch as it did not fulfil the three-day requirement of that provision, as the dates of the invoices show.

The remaining provision affecting the ultimate price Nesco was allowed to charge under the OPS regulation concerns the deduction which it would have been required to allow appellant under certain conditions. Appellant merely assumes that the scrap was sold on a "where is" basis, and that, therefore, the provision allowing a deduction is applicable to the facts in this case. On that assumption it bases a claim of a 1¢ overcharge, in violation of the regulation, on the total scrap invoiced from July 5, 1951, to February, 1953. Appellant argues that since a 1¢ deduction was due it, Nesco, in order to arrive at the rates at which it billed Wolinsky must have added a 1¢ premium charge. The argument is that after a deduction of loading charges from the maximum rates, fixed in Table A at 19⅛¢ and 17⅞¢ per pound for "heavy" and "light" scrap, respectively, the applicable rates to Wolinsky were 18⅛¢ and 16⅞¢. To those rates, it is contended, Nesco added a 1¢ premium in order to arrive at the rates of 19⅛¢ and 17⅞¢ which it charged Wolinsky. Appellant attempts to support its argument by showing that after OPS Regulation 47 went into effect, Nesco's invoices showed ac-

cumulations of scrap in amounts of 40,000 pounds or more. But Wolinsky, not Nesco, got the benefit of those accumulations, and the testimony shows that appellant received a 1¢ premium from the mills.

The overwhelming evidence is that the brass scrap was collected and deposited in bags and hoppers by Nesco employees, that it was weighed by and certificates were prepared by Nesco personnel, that the scrap was stored in the plant by Nesco personnel until it was eventually taken to the dock by Nesco employees and there loaded by Nesco employees onto the Wolinsky conveyance. Clearly, those operations having been performed by Nesco's employees, the scrap was sold on the f.o.b. point-of-shipment basis provided for in subparagraph (1) of sec. 4 (a), which states that "the ceiling prices, f.o.b. point of shipment . . . is the applicable price set forth in that table [Table A]." The regulation defines "f.o.b. point of shipment" as "the point at which brass mill scrap is loaded on a conveyance for transportation to the buyer's receiving point." Further, even if the buyer had done the loading, which it did not do here, the regulation does not provide for a flat deduction of 1¢ per pound of scrap. It provides only for the *cost* to the buyer.

Sec. 4, par. (b) of the regulation applies to dealers. Under subparagraph (1), "a *dealer selling to a consumer* [here the mills] was allowed to add 'an amount not to exceed ½¢' per pound of scrap to the price determined in accordance with paragraph (a)," *i. e.*, the f.o.b. point-of-shipment price fixed in Table A, plus a quantity premium, where allowable, under Table B. It may be noted that under sec. 4, (b) (2) a dealer selling to a dealer was allowed to sell at a rate 1½¢ per pound higher than the ceiling price determined in accordance with paragraph (a), but he was disallowed any quantity premium in connection with the sale of brass. The reason for the additional allowances to dealers is set forth in the OPS bulletin as follows:

"In order to permit dealers to operate and to provide an incentive for their collection of scrap from many small and scattered sources, the regulation establishes ceiling prices for sales by dealers which are $\frac{1}{2}¢$ per pound higher than the ceiling prices applicable to sales by persons other than dealers. This provision reflects the recommendation of both dealers and consumers."

Further, in a separate section, sec. 5, of OPS Regulation No. 47, *ceiling delivered prices* are discussed. That section applies to all sellers of scrap, not specifying as to dealers or other persons. Under that section, when the seller made delivery to the buyer's receiving point by public carrier, "an amount not in excess of the actual charge (including transportation taxes)" was chargeable to the buyer. Or, if such delivery was made by a vehicle owned or controlled by the seller, "an amount not in excess of the lowest published and applicable motor common carrier charge (not including transportation taxes) for transporting the quantity of brass mill scrap being priced from the point, or points, of shipment to the buyer's receiving point" was chargeable to the buyer.

From the foregoing it will be seen that, under OPS regulations, appellant, for its part in maintaining the prompt flow of vital scrap from the generator to the mills and thence back to the factories, was entitled to a $1¢$ premium charge on 40,000-pound loads, plus an additional $\frac{1}{2}¢$ per pound allowed to dealers selling to a consumer, plus transportation charges f.o.b. point of shipment to the buyer's receiving point (the mills). In addition to those charges, appellant now claims that it is entitled to a flat $1¢$ per pound deduction for loading, because "the material was then transported solely under Wolinsky's control from the Nesco plant to the Wolinsky yard." If Nesco had transported the scrap to Wolinsky's yard (in addition to loading it on the Wolinsky conveyance), Nesco could have billed Wolinsky for such transportation, and the price of the scrap would have been the delivered

ceiling price. Wolinsky, by transporting the scrap itself, merely avoided transportation charges by Nesco.

We fail to see where the case of *Badger C. & C. Co. v. Sterling M. C. Co.* 180 Wis. 79, 192 N. W. 461, cited by appellant, has any application to the instant case. In that case an actual overcharge was made by the fraudulent means of dating orders back to a time before the Lever Act took effect and charging the former higher price. In the present case, appellant does not even claim that orders were dated back by respondent in order to take advantage of any previous higher rates. The claim here is that an overcharge was made as a premium *under the OPS regulation.* Nesco's invoices show that OPS ceiling prices were strictly adhered to from the first billing made after the regulation took effect. Nesco never made any premium charge whatsoever; and under the facts of this case, it was not required to make a loading deduction to appellant, because it, and not appellant, had the cost of loading the brass scrap onto Wolinsky's truck.

We have checked the invoices and find that no premium quantity charges were ever made by Nesco. In view of that fact, it is unnecessary to discuss further the lengthy testimony as to dates and amounts of billings made by Nesco, whether in 40,000-pound lots or not. Nesco never claimed to fulfil the three-day requirement for quantity premiums, as its invoices show, and did not benefit from the premium allowance. The "Calamici memo," relied upon by appellant, was an interoffice communication written by D. J. Calamici to F. O. Reibold in the absence of Mr. Lohman. It was disregarded by Mr. Lohman as erroneous. If of any importance, it merely shows further that Wolinsky was receiving 40,000-pound shipments of scrap upon which it could, and did, receive a 1¢ per pound quantity premium.

In concluding, we call attention to the fact that Wolinsky and Nesco both were bound by the OPS regulation. If Wolinsky considered that it was being charged more than the

OPS ceiling price, it was its duty to refuse payments. However, it did pay all invoices in full from the time the regulation took effect to the last part of September, 1952. Therefore, if its claims were true, it, as well as Nesco, would have to be considered as violating the OPS regulation.

It is manifest to this court that Nesco followed OPS Regulation No. 47 precisely, and the complaint of appellant as to respondent's violation of the regulation is absolutely unfounded.

The judgment in the action of New York Shipbuilding Corporation, plaintiff, against Wolinsky Iron & Metal Company, Inc., defendant, awarding plaintiff recovery of the principal sum of $17,174.40, together with interest at 5 per cent from and after February 1, 1953, in the sum of $2,667.67, together with costs and disbursements taxed at $326.80, aggregating the total sum of $20,168.87, must be affirmed.

The judgment in the action of Wolinsky Iron & Metal Company, Inc., plaintiff, against New York Shipbuilding Corporation, defendant, dismissing the complaint of the plaintiff on its merits, together with costs and disbursements taxed at $100 must be affirmed.

*By the Court.*—Judgments affirmed.